

**05-CV-02121-EXH**  1 - 50

# EXHIBIT A

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

**05-2-39002-6 SEA**

LEE FAMILY INVESTMENTS by and through
its Trustee W. B. LEE, Derivatively and on behalf
of Nominal Defendant WASHINGTON
MUTUAL, INC.,

       Plaintiff,

    v.

KERRY K. KILLINGER, THOMAS W.
CASEY, DEANNA W. OPPENHEIMER, ANNE
V. FARRELL, STEPHEN E. FRANK, PHILLIP
D. MATTHEWS, MICHAEL K. MURPHY,
MARGARET OSMER MCQUADE, MARY E.
PUGH, WILLIAM G. REED, JR., JAMES H.
STEVER, WILLIS B. WOOD, JR.,

       Defendants,

And

WASHINGTON MUTUAL, INC.,

       Nominal Defendant

Case No. _____

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT;
DEMAND FOR JURY TRIAL**

JURY REQUESTED

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 1
J:\Man\LM-Ed\Lee v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF
MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

ORIGINAL

**Exhibit A**

1    Plaintiff Lee Family Investments by and through its Trustee, W. B. Lee, ("Plaintiff"),

2   derivatively and on behalf of Nominal Defendant Washington Mutual, Inc. by and through his

3   undersigned attorneys, and for his Complaint against Individual Defendants herein, alleges the

4   following based upon personal knowledge of the Plaintiff, and on information and belief as to

5   all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's

6   attorneys, which included, among other things, a review of the Defendants' public documents,

7   public announcements made by the Defendants, United States Securities and Exchange

8   Commission ("SEC") filings, wire and press releases published by and regarding Washington

9   Mutual, Inc. (hereafter "Washington Mutual" "WaMu" or the "Company") and information

10  readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will

11  exist for the allegations set forth herein after a reasonable opportunity for discovery.

12                          **I.     INTRODUCTION**

13    1.    This is a shareholder derivative action brought by Plaintiff and shareholders of

14  Washington Mutual against certain current or former officers and directors of Washington

15  Mutual seeking to remedy the Individual Defendants' violations of state law, including breaches

16  of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust

17  enrichment and negligence that occurred from April 15, 2003 through the present, (the

18  "Relevant Period") and that have caused substantial losses to the Company. [1]

19

20

21

----

22  [1] Because Defendants have failed to take action to remedy the breaches of fiduciary duties that
    occurred between April 15, 2003 and June 28, 2004, the Relevant Period continues through
23  this day instead of ceasing on June 27, 2004, the day before the public became aware of the
    wrongdoings at the Company.

24  VERIFIED SHAREHOLDER DERIVATIVE
    COMPLAINT; DEMAND FOR JURY TRIAL - 2                      LAW OFFICES OF
25  J:\Miami\ U.S. LII\Lee v. Killinger\Pleadings\Complaint (2).doc
                                                  MIKKELBORG, BROZ, WELLS & FRYER PLLC
                                                            1001 FOURTH AVENUE, SUITE 3600
                                                              SEATTLE, WASHINGTON 98154-1115
                                                                     (206) 623-5890

## II.   PARTIES

2.      Plaintiff, Lee Family Investments, by and through its Trustee, W. B. Lee, as set forth in the accompanying Verification, is, and was during the Relevant Period, a shareholder of Washington Mutual. Mr. Lee is a resident of the State of Washington.

3.      Nominal Defendant Washington Mutual is a Washington corporation with its principal place of business at 1201 Third Avenue, Seattle, Washington.  According to the Company's press releases, Washington Mutual is a retailer of financial services that purports to provide a diversified line of products and services to consumers as well as commercial clients. On March 31, 2004, Washington Mutual and its subsidiaries had assets of $280.77 billion, and at that time operated more than 2,400 retail banking, mortgage lending, commercial banking and financial services offices throughout the United States.

4.      Upon information and belief, Defendant Kerry K. Killinger ("Killinger") is a resident of the State of Washington.  Defendant Killinger maintained dominance and control over the Company during the Relevant Period and, throughout this time, consolidated control over the Company by simultaneously holding the offices of Chairman of the Board of Directors, President, and Chief Executive Officer of Washington Mutual and served as a member of the Executive Committee and President's Council of the Company.  Defendant Killinger has been Chairman, President, and CEO of Washington Mutual since 1991.  He became President and a director in 1988, CEO in 1990, and Chairman in 1991.  In 1990, Defendant Killinger established the Executive Committee to facilitate and coordinate decision-making by, and communication among, the most senior executive officers of the Company who, as a committee, determine the Company's strategic direction.  The President's Council, established by Defendant Killinger in December 2002 and comprised of the Chief Financial

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 3
J:\Main\U F F\Lee v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE. SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

1   Officer, the Chief Administrative Officer, and the Group Presidents, is purportedly focused on
2   operational efficiency, operational decision-making, and strategic execution, with particular
3   emphasis on operations and execution across business segments. Defendant Killinger attended
4   and presented operational and financial information regarding Washington Mutual to investors
5   and stock market analysts in press releases, at conferences and during conference calls
6   throughout the Relevant Period. Accordingly, Defendant Killinger was personally involved in
7   virtually all aspects of Washington Mutual's business at issue in this case during the Relevant
8   Period.   Additionally, during the Relevant Period, Defendant Killinger sold in excess of
9   231,587 shares of Washington Mutual stock at artificially inflated prices and reaped proceeds
10  of $9,734,093. Killinger received an additional $8.9 million worth of Washington Mutual stock
11  under the Company's Performance Share Program as a personal incentive for achieving certain
12  reported financial results for the Company in, among others, the 2003 year.

13      5.      Upon information and belief, Defendant Thomas W. Casey ("Casey") is a
14  resident of the State of Washington.  During the Relevant Period, Defendant Casey was
15  Executive Vice President and Chief Financial Officer of the Company, as well as a member of
16  both the Executive Committee and the President's Council.  Moreover, Defendant Casey
17  attended and presented operational and financial information regarding Washington Mutual to
18  investors and stock market analysts in among others, press releases, at conferences and during
19  conference calls throughout the Relevant Period.  As such, Defendant Casey was personally
20  involved in virtually all aspects of Washington Mutual's business at issue in this case during
21  the Relevant Period.

22      6.      Upon   information   and   belief,   Defendant   Deanna   W.   Oppenheimer
23  ("Oppenheimer") is a resident of the State of Washington.   During the Relevant Period,

24  VERIFIED SHAREHOLDER DERIVATIVE
    COMPLAINT; DEMAND FOR JURY TRIAL - 4
25  J:\Main\DALE-LM.ee v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

1    Defendant Oppenheimer was the President of the Consumer Group and a member of the

2    Company's executive management team.   During the Relevant Period, Oppenheimer was

3    responsible for two of Washington Mutual's reporting segments: Retail Banking and Financial

4    Services, and Mortgage Banking. Defendant Oppenheimer became an officer of the Company

5    in 1985, a member of the Executive Committee in 1990, Executive Vice President in 1993, and

6    a member of the President's Council in 2002.  Moreover, Defendant Oppenheimer attended and

7    presented operational and financial information regarding Washington Mutual to investors and

8    stock market analysts in among others, press releases, at conferences and during conference

9    calls throughout the Relevant Period.   As such, Defendant Oppenheimer was personally

10   involved in virtually all aspects of Washington Mutual's business at issue in this case during

11   the Relevant Period. Oppenheimer unexpectedly "resigned" from Washington Mutual after the

12   close of the Relevant Period.    Additionally, during the Relevant Period, Defendant

13   Oppenheimer sold in excess of 139,000 shares of Washington Mutual stock at artificially

14   inflated prices and reaped proceeds of more than $6.1 million.   Defendant Oppenheimer

15   received an additional $2.3 million worth of Washington Mutual stock under the Company's

16   Performance Share Program as a personal incentive for achieving certain reported financial

17   results for the Company in, among others, the 2003 year.

18          7.     Upon information and belief, Defendant Anne V. Farrell ("Farrell") is a resident

19   of the State of Washington.  During the Relevant Period, Defendant Farrell was a member of

20   Washington Mutual's Board of Directors.

21          8.     Upon information and belief, Defendant Stephen E. Frank ("Frank") is a

22   resident of the State of California.  During the Relevant Period, Defendant Frank was a member

23   of Washington Mutual's Board of Directors.

24   VERIFIED SHAREHOLDER DERIVATIVE
     COMPLAINT; DEMAND FOR JURY TRIAL - 5
25   J:\Main\MLB-EBL\re v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1601 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

9.      Upon information and belief, Defendant Phillip D. Matthews ("Matthews") is a resident of the State of California.  During the Relevant Period, Defendant Matthews was a member of Washington Mutual's Board of Directors.

10.     Upon information and belief, Defendant Michael K. Murphy ("Murphy") is a resident of the State of South Carolina.  During the Relevant Period, Defendant Murphy was a member of Washington Mutual's Board of Directors.

11.     Upon information and belief, Defendant Margaret Osmer McQuade ("McQuade") is a resident of Alberta, Canada.  During the Relevant Period, Defendant McQuade was a member of Washington Mutual's Board of Directors.

12.     Upon information and belief, Defendant Mary E. Pugh ("Pugh") is a resident of the State of Washington.  During the Relevant Period, Defendant Pugh was a member of Washington Mutual's Board of Directors.

13.     Upon information and belief, Defendant William G. Reed, Jr. ("Reed") is a resident of the State of Washington.  During the Relevant Period, Defendant Reed was a member of Washington Mutual's Board of Directors.

14.     Upon information and belief , Defendant James H. Stever ("Stever") is a resident of the State of Colorado.  Defendant Stever was, during the Relevant Period, a member of Washington Mutual's Board of Directors.

15.     Upon information and belief, Defendant Willis B. Wood, Jr. ("Wood") is a resident of the State of California.  During the Relevant Period, Defendant Wood was a member of Washington Mutual's Board of Directors.

16.     The defendants referenced above in ¶¶8-15 are collectively referred to herein as the "Individual Defendants."

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 6
I:\Mam\WEU-LIN.cc v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF
MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

17.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, operational trends, financial results, hedging and related activities, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

18.    As officers and controlling persons of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange (the "NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, hedging, risk management and related activities, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.

19.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or deliberately disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 7
J:\Main\MLE-LDLee v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF
MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

1  misleading nature.   Because of their Board membership and/or executive and managerial
2  positions with Washington Mutual, as well as their admitted regular attention to the hedging,
3  risk management and related issues in this case, each of the Individual Defendants had access
4  to the adverse undisclosed information about Washington Mutual's business prospects and
5  financial condition and performance as detailed herein and knew (or deliberately disregarded)
6  that these adverse facts rendered the positive representations made by or about Washington
7  Mutual and its business issued or adopted by the Company materially false and misleading.

8      20.     The Individual Defendants, because of their positions of control and authority as
9  officers and/or directors of the Company, were able to and did control the content of the
10 various SEC filings, press releases and other public statements pertaining to the Company
11 during the Relevant Period.   Each Individual Defendant was provided with copies of the
12 documents alleged herein to be misleading, prior to or shortly after their issuance, and/or had
13 the ability and/or opportunity to prevent their issuance or cause them to be corrected.
14 Accordingly, each of the Individual Defendants is responsible for the accuracy of the public
15 reports and releases detailed herein and is therefore primarily liable for the representations
16 contained therein.

17      **III.    BACKGROUND AND ADVERSE FACTS UNDERMINING THE**
18      **VERACITY OF INDIVIDUAL DEFENDANTS' RELEVANT PERIOD**
19      **REPRESENTATIONS**

20

21      21.     By April 2003, Washington Mutual grew to become one of the nation's ten
22 largest banks and the second largest mortgage loan originator.   Washington Mutual
23 accomplished much of this growth through acquisitions.   Between January 2001 and early

24 VERIFIED SHAREHOLDER DERIVATIVE
   COMPLAINT; DEMAND FOR JURY TRIAL - 8
25 J\Mass\M.B-LRLcc v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623 5890

2002, Washington Mutual purchased almost $25 billion in assets through the following acquisitions:

| Date | Equity Acquired | Purchase Price |
|---|---|---|
| January 30, 2001 | PNC Mortgage | $7.00 billion |
| February 9, 2001 | United Bank | $1.40 billion |
| June 1, 2001 | Fleet Mortgage | $7.50 billion |
| January 1, 2002 | Dime Bancorp | $5.30 billion |
| Early 2002 | Homeside Lending | $2.45 billion |

22.     According to the Company's Form 10-K for the period ending December 31, 2003 ("2003 10-K"), Washington Mutual offers home loan products, such as fixed-rate home mortgage loans, adjustable-rate home mortgage loans (where the interest rate may be adjusted as frequently as every month), and hybrid home mortgage loans (where the interest rate is fixed for a predetermined time period and then re-prices monthly or annually), through multiple lending channels. Washington Mutual's Mortgage Banking segment primarily originates and services home mortgage loans, buys and sells home mortgage loans in the secondary market, and provides insurance-related products.

23.     According to the Company's 2003 10-K, mortgage servicing involves the administration and collection of home loan payments. The Company's Mortgage Banking segment performs most mortgage servicing activities, including the servicing of loans held in portfolio by the Company's Retail Banking and Financial Services segment. When loans are

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 9
J:\Main\LALE-I\DLsc v  Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON  98154-1115
(206) 623-5890

1   sold into the secondary market, Washington Mutual generally retains the right to service those

2   loans.

3       24.    Because a material amount of Washington Mutual's business is derived from

4   Mortgage Banking, the Company's financial health was critically dependent, at all relevant

5   times, on its mortgage-related business activities.  As such, the volume of activity in the

6   housing market has particularly important implications for the Company's profitability. Prior to

7   and at the beginning of the Relevant Period, U.S. mortgage interest rates were at historic lows.

8   As widely reported, the decrease in mortgage interest rates caused consumers to increase

9   mortgage applications for new home purchases, refinance their mortgages frequently and take

10  equity out of homes at an unprecedented pace.

11      25.    When a borrower refinances a mortgage, a mortgage servicing company such as

12  Washington Mutual loses out on collecting future interest payments on that mortgage.  Such

13  payments are a key source of profit that comes from the servicing of mortgages (known as

14  Mortgage Servicing Rights, or "MSR").

15      26.    In mid-June 2003, mortgage interest rates began rising from 45-year lows.

16  When mortgage interest rates increase, fewer borrowers refinance their mortgages and

17  mortgage servicing revenues and profits increase.  New loan originator volumes, however,

18  necessarily decrease when mortgage rates increase.  When new loan volumes drop due to

19  increased mortgage interest rates, mortgage banks, including Washington Mutual, are expected

20  to rely on their MSR business, in part, to "hedge" their losses from reduced new loan volumes

21  and refinances. The purpose of the "hedge" is to offset variability in the net income or earnings

22  of the Company.

23

24  **VERIFIED SHAREHOLDER DERIVATIVE**
    **COMPLAINT; DEMAND FOR JURY TRIAL - 10**

25  J:\Main\M.I.F\Clkee v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

27.     Throughout the Relevant Period, according to Individual Defendants' repeated public statements, Washington Mutual not only "balanced" its business and risk in this fashion, but also engaged in other established forms of hedging to reduce or eliminate risk associated with changing interest rates.  At all times, Washington Mutual's ability to successfully perform in the face of rising interest rates was critically dependent on the extent to which the Company was properly hedged, both as a result of diversity in business offerings and through other established hedging techniques.

28.     As discussed further in the section below, entitled "Materially False and Misleading Statements Made During the Relevant Period," Individual Defendants continually represented to the investing public that Washington Mutual was, in fact, properly hedged in the face of increasing interest rates.   For example, during a public CNBC interview at the beginning of the Relevant Period, Defendant Killinger stated that Washington Mutual used "either securities or certain derivatives just to balance out the interest rate risk."  Indeed, at the beginning of the Relevant Period, Individual Defendants went as far as to publicly state that the Company would be in a "stronger position when the current [interest rate] environment changes."  Thereafter, throughout the Relevant Period, Individual Defendants (i) purported to describe, in detail, the Company's hedging instruments in quarterly and annual filings with the SEC, and (ii) repeatedly referred to Washington Mutual's purported "balanced business model," which Individual Defendants claimed provided a further "pure, natural business hedge" to rising interest rates.

29.     Individual Defendants' Relevant Period representations and assurances could not have been further from the truth.  In reality, throughout the Relevant Period, Washington Mutual was plagued with company-specific problems which undermined the veracity of their

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 11
F:\Main\C.L.F. 1.DF.ee v  Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1601 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

1  public representations as the Company could not properly hedge its interest rate exposure.

2  Nonetheless, Individual Defendants repeatedly stated the business was properly hedged in the

3  face of rising interest rates.

4        30.    As eventually admitted by Individual Defendants, Washington Mutual failed to

5  properly integrate its many acquisitions. During the Relevant Period, Washington Mutual used

6  no less than nine separate computer systems to originate mortgage loans, including systems

7  used by acquired banks. Individual Defendants also eventually admitted that the failure to

8  integrate these numerous computer systems caused material delays in closing mortgages and,

9  even worse, made it impossible for the Company to properly hedge interest rate exposure in the

10  face of rising interest rates.

11        31.    The true facts began to be disclosed to investors in the Fall of 2003. First, at a

12  Lehman Brothers Financial Services Conference on September 9, 2003, Defendant Killinger

13  mentioned "mortgage banking process system challenges," which he stated "created some

14  imprecision in the matching of our loan commitments and pipeline hedging activities" during

15  the then-pending third quarter 2003. However, at that time, Killinger stated that Washington

16  Mutual had taken "immediate steps to address any of the operating challenges" and was "back

17  on track."

18        32.    Thereafter, during an October 22, 2003 conference call with securities analysts

19  regarding the Company's third quarter 2003 results, Defendant Casey also acknowledged

20  "operational problems" regarding the "timeliness of information flows," which resulted in

21  "certain loan commitments not being reflected in [Washington Mutual's] hedging profile on a

22  timely basis." Similar to Killinger's statements on September 9, 2003, however, Defendant

23  Casey stated during the October 22, 2003 conference call that the problems had been addressed

24  VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 12
25  J:\Main\LM.E-LP\Lee v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

through "improved information flows, better tracking of loan commitments, and stronger oversight." During the same call, Killinger also stated:

> I think, in terms of operational measures, as soon as we saw that there were -- was an inconsistency of the data coming in between the rate locks and what we needed to do for hedging, we jumped on that immediately, put in a very large SWAT team of folks to get their arms around things. They got that stabilized very quickly, and then we immediately implemented a variety of measures to be sure that that would not happen again. We are very confident, at this point in time, that the flows of information are accurate, and that the financial risk that we encountered early in the third quarter is taken care of at this point.

33.     Defendant Casey repeated Killinger's assurances at Washington Mutual's December 9, 2003 Investor's Day Conference. Casey told investors: "Kerry mentioned we also experienced operational challenges in our mortgage business in the third quarter. As we stated on several occasions, we have identified the issues that lead to these problems and have implemented the appropriate measures to address them."

34.     Little more than six months later, however, on June 28, 2004, the last day of the Relevant Period, Washington Mutual surprised investors by announcing a very significant earnings and net income shortfall which the Company attributed to rising interest rates. The disclosure reduced Washington Mutual's market capitalization by approximately $2.5 billion and caused numerous market and industry analysts to issue critical reports regarding the Company, including reports that the adverse results disclosed by Washington Mutual were the result of ongoing, company-specific problems with integration and interest rate hedging which had not been adequately addressed as previously stated by Individual Defendants.

35.     For example, on August 9, 2004, *Fortune* issued a detailed report regarding the Company entitled *"What Went Wrong at WaMu?"* In the report, *Fortune* noted:

> On June 28, WaMu issued an extraordinary press release announcing a huge downward adjustment in its earnings forecast. It blamed the had news on

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 13
J:\Main\DALE-L\DLee v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF
MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

"expectations for a sustained increase in long-term interest rates." Huh? How could one of America's biggest mortgage lenders claim that the upward march that everyone knew was coming, that Alan Greenspan had been heralding in neon red, was somehow a surprise?

\* \* \*

**WaMu suffers from two maddening problems of its own making. First, it didn't push hard enough to integrate its many acquisitions.** As a result, it is saddled with a hodge-podge of outdated computer systems that cause delays and confusion in closing loans. The lack of integration has also prevented WaMu from reaping the savings it needs to make those acquisitions -- which cost a total of $26 billion -- pay off for shareholders.

**It has failed to master a second crucial part of its business as well: hedging interest rate risk.**

\* \* \*

Take a closer look at the mortgage business, and it's easy to see how profits have evaporated. Start with computer systems. In 2000 the Company announced that it was creating a highly advanced, proprietary platform to handle most of its home-loan operations. It developed the system with Accenture and named it Optis, meaning "best."

\* \* \*

Optis worked well for processing mortgage applications, but it failed in the far more important tasks of processing, underwriting, and closing the loans. According to sources familiar with WaMu's IT operations, the Company started shutting down Optis in March [2004]; the snafu was a big contributor to WaMu's $248 million of charges in recent quarters. The Company has never acknowledged that it is eliminating most of Optis, on which it is said to have spent more than $500 million, or divulged the amount it will eventually have to write down.

**Today WaMu still uses an amazing nine separate systems to originate loans,** including one called LoanWorks that it has employed since its days as a small thrift and others that it picked up from acquisitions. The systems have great trouble talking to one another.

\* \* \*

The systems confusion caused a blowup late last year. Like all banks, WaMu lets borrowers lock in their rate until the mortgage closes. It's critical to hedge that exposure, because rates can rise before the loan is funded, forcing the bank

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623 5890

to take a loss. But last year, as rates began to tick up, WaMu's antiquated systems lost track of the locks the bank had granted on loans in its pipeline.

\*      \*      \*

CEO Killinger says that WaMu delayed integrating its acquisitions during the boom so that it could focus on writing more loans — a strategy that generated huge profits until last fall's meltdown. "This integration has simply taken too long," he says. "We didn't execute our normal game plan." He says WaMu is working to unify its systems and plans to be down to five platforms by year-end.

36.     After the end of the Relevant Period, Individual Defendants also admitted that integration problems continued to persist throughout the Relevant Period, even after they had stated in September, October and December of 2003 that the problems had been addressed through, inter alia, "improved information flows, better tracking of loan commitments and stronger oversight." For example, during a July 22, 2004 conference call, as set forth below, Defendant Killinger stated:

> Let me remind everyone, that we assembled a large mortgage lending franchise through a series of acquisitions in a relatively brief period. We acquired P&C [sic] Mortgage, Fleet Mortgage, HomeSide Lending and North American Mortgage. The refinancing boom hit and we had the opportunity to derive significant profits from these acquisitions. We did not complete the integration of these operations during the refi boom, because we decided at the time that the software systems we were developing internally would provide a better road to conversion.    So, we did not execute on a long held practice of fully integrating acquisitions into a common systems platform in a short period of time.

\*      \*      \*

> [A]nd quite frankly, when we did undertake this integration effort, we did not execute as well as we should have. We had some technology and system challenges which became larger than anticipated, in other words, we did not execute our normal game plan. That then delayed building the kind of mortgage business we want to have; One like our retail banking business that is high-volume, low-cost, scalable and focused. This integration has simply taken too long.

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

\*   \*   \*

**Last call, it became apparent to me that the management teams leading our mortgage banking group was not making satisfactory progress in addressing these challenges. So we made some big changes. We replaced several people and asked our entire executive team to step up and help assess the situation. We discovered the problems of the mortgage banking unit were substantial.**

\*   \*   \*

**Let me conclude with a summary of our outlook for the mortgage operations. We have a huge amount of work ahead of us over the next several quarters to get where we want to be. There are some quick fixes but there are some things that will take time.**

37.     In order to properly hedge Washington Mutual's interest rate exposure, Individual Defendants needed to have complete and precise information concerning the Company's aggregate mortgage loan portfolio and MSR positions at all times. Absent such information, it would have been impossible to configure proper hedges due to interest rate fluctuations. In other words, because interest rates are constantly changing, Individual Defendants needed to know, at all relevant times, the details of each loan in the Company's pipeline so that they could hedge the interest rate exposure associated with those loans. Complete and precise information, however, would have required effective communication between and among Washington Mutual's many computer systems. In reality, the Company's systems could not (and did not) function properly. Nonetheless, Individual Defendants made numerous materially false and misleading statements during the Relevant Period that the Company had properly hedged its business in the face of rising interest rates.

38.     Because of its outdated and problematic computer systems throughout the Relevant Period, Washington Mutual did not have a clear understanding of its loan pipeline and the corresponding interest rate risk associated with those loans in the face of fluctuating interest

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT: DEMAND FOR JURY TRIAL - 16
J:\Main\RM\F\LD\Lee v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF
MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

1    rates. Assumptions underlying hedging in the face of interest rate changes include critical
2    information regarding the loan pipeline, complete and precise knowledge of all loans in the
3    system, the interest rates being locked, the existence of loan processing delays, and whether the
4    computer systems and personnel can process the volume and capacity of loans in the pipeline.
5    As set forth below and otherwise herein, Individual Defendants did not have a grasp on this
6    critical information by their own admission.

7    39.     Washington Mutual's computer systems could not properly process loans during
8    the Relevant Period.  Loan processing delays would cause interest rate locks to expire and
9    require important customer documentation and appraisals to be redone. Optis significantly
10   slowed the Company's ability to process loans in a timely manner. Loan rates often locked at or
11   after 90 days which caused WaMu to lose money on those loans when interest rates rose.

12   40.     The Company had significant technology challenges that affected its business.
13   WaMu did not have the technological systems to integrate the data needed to make calculations
14   in the capital market or secondary market arena.  Many of these calculations were done
15   manually. Optis was supposed to rectify these problems, but did not work to capacity.  By the
16   middle of 2003, almost a full year after if was originally supposed to be deployed, Optis was
17   only partially deployed before it had to be stopped due to its inability to handle the high
18   capacity.  The Company was experiencing serious problems with Optis from the beginning.
19   These problems included performance problems, failure to get the system to run, and software
20   and hardware problems in or about June 2003.

21   41.     Washington Mutual was so far behind in its loan processing that it consistently
22   failed to send loan "packages" to customers on a timely basis which delayed processing and
23   legal compliance.  The Company's loans contained significant errors and problems since there

24   **VERIFIED SHAREHOLDER DERIVATIVE**
     **COMPLAINT; DEMAND FOR JURY TRIAL - 17**
25   F:\Main\LSLE-LEEce v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE,  SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

1  was poor, inadequate, and virtually non-existent quality control in loan processing. Optis was

2  major part of the Company's problems, because Optis could not produce the productivity that

3  Washington Mutual absolutely needed; Optis missed deadline after deadline and it was widely

4  known at the Company that Optis was a failing technology. Moreover, they had to turn off the

5  phone lines for three to four months at one loan center to delay accepting new loan applications

6  due to Optis and Washington Mutual's inability to process pending loan applications.

7      42.    In spite of these problems, Washington Mutual instructed its employees to

8  accept applications (and fees) from almost every customer who came in, regardless of whether

9  the loan had any chance of approval. This led to Washington Mutual's loan pipeline being

10 inundated with loans, some of which had no chance of approval. As a result, Washington

11 Mutual accepted applications (and fees) from customers who had no chance of being approved,

12 including customers who had been rejected by the Company's electronic underwriting system,

13 thereby further clogging the Company's computer system and causing further delays. Also

14 exacerbating these delays was the Company's directive not to deter customers from locking in

15 rates. Once a customer locked in a rate and the processing of the loan was delayed (which it

16 often was), Washington Mutual would make little or no money on the loan if interest rates rose.

17 Many of Washington Mutual's loans needed extensions, even with 90-day rate locks, which

18 was exacerbated by the Company's archaic computer systems requiring separate processing

19 and underwriting systems.

20     43.    All of these serious delays and slowdowns impacted Washington Mutual's

21 ability to properly hedge its interest rate risk. Proper hedging must take into account, among

22 other things, the average time it takes to close a loan after the customer locks in a rate.

23 Otherwise, the hedge does not adequately account for the risk associated with a particular loan.

24 VERIFIED SHAREHOLDER DERIVATIVE
   COMPLAINT; DEMAND FOR JURY TRIAL - 18
25 J:\Main\WMI: LD&es v Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

For example, if a hedge assumes that a loan will close within 60 days, but in reality it takes 90 or 120 days or even longer, that hedge fails to take into account all of the interest rate risk associated with the loan. This is precisely what happened at Washington Mutual, as Individual Defendants admitted in the Fall of 2003 when they misleadingly assured investors that the computer problems impacting the Company's ability to properly hedge were resolved. After locking in a loan at a specific rate, the Company would take so long to close the loan that the rates would go up and Washington Mutual would be negatively impacted. Although Optis was supposed to fix this problem, it just made things worse because Optis was unable to process transactions from start to finish, and the Company just lost more time transferring customer information from one system to another. Optis was designed when interest rates were decreasing and was apparently slow to respond in the face of increasing interest rates. Washington Mutual did not know what its loan volume was, that it ended up closing more loans than expected, and that this caused a delay in the processing of loans.

44. Optis suffered from a number of problems. Optis was poorly designed and experienced support problems when too many users logged on. In addition, Optis failed to upload systems correctly and was not being maintained by the Company's operational centers. Moreover, the Company's multiple systems and the failure to properly integrate product offerings from its multiple acquisitions were major problems. As such, Washington Mutual's computer systems produced an incorrect loan pipeline impression.

45. Moreover, accurate reporting of data was a challenge at the Company due to its technology problems. This included problems with Optis and the fact that the Company was utilizing several different platforms which caused accuracy problems. The technology, rate lock and pipeline challenges were discussed at weekly production meetings.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT; DEMAND FOR JURY TRIAL - 19
J:\Main\...\Complaint (2).doc

LAW OFFICES OF
MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

46.     Thus, while Individual Defendants repeatedly told the public that the Company's hedging was sound and, later in the Relevant Period, that the technological problems underlying Washington Mutual's hedging problems were behind them, these problems persisted. Proper hedging requires proper internal controls and accurate and complete information about the Company's aggregate mortgage loan portfolio and MSR positions at all times. By their own admission, Individual Defendants did not have such information and acted with intent or deliberate recklessness by, among others, continually representing that Washington Mutual had these serious problems under control.

## IV.   MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE RELEVANT PERIOD

### A.   First quarter of 2003 ("1Q:03")

47.     1Q:03 Results.   On April 15, 2003, the beginning of the Relevant Period, Washington Mutual published a release on Business Wire which announced "record" financial results for the first quarter of 2003, the period ended March 31, 2003. The next day, April 16, 2003, Individual Defendants hosted a conference call for investors and analysts, during which Defendant Killinger told investors that the Company would be in a "stronger position when the current [interest rate] environment changes." Defendant Casey further advised investors that Washington Mutual was, in fact, taking necessary and proper steps so as to account for "eventual changes in [the] interest rate environment." Defendant Casey stated during the call:

**At this time we are focused on balancing the demands of today while positioning the company for the eventual change in interest rate environment. And our balanced business model will provide the leverage to continue to grow market share in a changing environment.  In addition to strong mortgage lending volume, we also continue to produce exceptional**

LAW OFFICES OF
MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-1890

numbers in other lending categories, most notably home equity and multifamily
lending....

Let's now talk about the key drivers behind the 74% growth in non-interest
income in the first quarter of 2003 compared with a year ago.  The company
produced another strong quarter of home loan mortgage banking income while
demonstrating continued solid performance in our risk management activities.
**During the first quarter, our internal business hedge for mortgage
operations, along with the financial hedge of revaluation gained from
derivatives worked sufficiently to offset the change in value of** MSR asset.

\*        \*        \*

I earlier spoke about our disciplined approach to managing the pricing of
liabilities, specifically the platinum account.   Now let me discuss another
example of our disciplined approach to managing our business. **As part of the
company's ongoing interest rate risk management program and positioning
of the balance sheet for future rising rates, we repositioned certain acts and
liability hedging during the quarter.** In the process, we triggered a $87m loss,
which can be seen on the income statement. **We believe this was a prudent
step that will help us position for the future rise in interest rates.**

\*        \*        \*

**We continue to actively manage our credit risk profile as part of our
broader risk management discipline.**

Emphasis added.

48.      During the question and answer session of the Company's 1Q:03 conference
call, Defendant Casey responded to questions from stock market analysts.  In response to
analyst John Kline's questions regarding the Company's hedging of its MSR, Defendant Casey
stated, in part: "... we feel very good about our hedging activities for mortgage servicing
rights."  In response to analyst Kevin St. Pierre's question as to why Individual Defendants had
eliminated certain disclosure items from Washington Mutual's 1Q:03 press release, especially
items related to the Company's risk management, Defendant Casey stated as follows:

> KEVIN SAINT PIERRE, ANALYST, SANFORD BERNSTEIN: Thank you.
> You eliminated some items from a disclosure.  Namely roll-forward of the held

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 21
J:\Main\02\LE-Edl.ec v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623 5890

1   for sale portfolio as well as the roll forward in the loans portfolio, as well as the
2   rate management, risk management contracts. My question would be, why were
    those eliminated...?

3   THOMAS CASEY: The first comment you had was with regard to changes that
4   we put into the press release of the we just felt there was a significant amount of
    detail that was being provided. That is going to be in the queue, but -- in an
5   attempt to industry try to streamline this document, it was getting quite large.
    We feel that the information is provided in --- I guess would be a lagging in the
6   queue. But no specific reason other than trying to simplify our disclosures. So
    you'll see that information in the queue....

7
8   49.    Moreover, in response to questions from J. P. Morgan analyst Viveck Juneja for

    clarification regarding the Company's MSR hedging gains, Defendant Casey stated:

9   With regard to the MSR hedge, just -- not to get into too much detail, we can go
10  off line and take you through how this works, but the fact that we anticipated the
    amortization during the quarter and actual results came through, our hedge was
11  effectively doing the same thing. If you notice, we didn't have to take any
    available for sale gains in our portfolio, which indicates that the hedge and the
12  amortization and the derivative portion of our hedge, were working in tandem
    with one another. **Again, we're very confident that our risk management is**
13  **working here, and when you see the offset here, I think we're feeling very**
14  **good about where we are.**

15  50.    **Killinger CNBC Interview.**   That same day, April 16, 2003, Defendant

16  Killinger appeared on the financial news cable-television network, CNBC, and granted an

17  interview during which he continued to condition the market to believe that the expected rise in

18  interest rates would not have a material adverse impact on Washington Mutual, as follows:

19  [W]e carefully manage all of the various portfolios we're in and we watch
    the national housing market very carefully. We do not have concerns that
20  there is a housing bubble being created on a national basis. However, you
    know, at certain localities around the country we have been watching things
21  very carefully and have adjusted our underwriting standards in certain parts of
    the country when that's appropriate....
22
    [W]e have a very balanced business model, one in which when housing's
23  doing strong, we get high levels of loan originations and gains on sale of

24

LAW OFFICES OF
MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

those loans and so forth.  When interest rates go up and we start to get a slowdown in housing, then we will have a real benefit of the servicing portfolio that we have of loans that we service for others, and that income should really kick in.  So as we do our internal financial planning for the balance of this year, we have kind of assumed that there would be a slowdown in the residential lending as the year went on from lower refinancings.  And we're still very comfortable that we'll be right in line with the earnings guidance that we've given the Street.

*    *    *

Well, the greatest amount of hedging we do is just a pure, natural business hedge.  Part of our business does better when interest rates are going up, part of it does better when interest rates are going down. And those really do a nice job of offsetting each other.  And that's given us this very, very strong secular growth rate that we've had over the last many years and relatively little volatility. Now, in addition to the natural business hedge, we do a certain amount of financial hedging just to be sure that we kind of smooth out those peaks and troughs a little bit more.  But the kind of financial hedging we do are straight over tackle.  We normally use either securities or certain derivatives just to balance out the interest rate risk.

(Emphasis added.)

51.    As set forth below, Individual Defendants did not have proper hedges in place and were unable to do so.  As they later admit, Individual Defendants could not have had proper hedges because they did not have technology in place that would allow them to properly hedge, whether internally or through outside investments.  Simply put, Individual Defendants did not know what they were balancing.  Nonetheless, they reassured the investing public that they "fe[lt] very good about [the Company's] hedging activities for mortgage servicing rights," and they were "very confident that [the Company's] risk management [was] working here."

52.    1Q:03 Form 10-Q.  On or about May 15, 2003, Individual Defendants filed with the SEC the Company's quarterly financial report, pursuant to Form 10-Q.  The 1Q:03

Form 10-Q contained representations that the Company was accurately reporting its financial

results and maintained adequate systems of internal operational controls, in part, as follows:

### Basis of Presentation

The accompanying Consolidated Financial Statements are unaudited and include the accounts of Washington Mutual, Inc. (together with its subsidiaries "Washington Mutual" or the "Company"). Washington Mutual's accounting and financial reporting policies are in accordance with accounting principles generally accepted in the United States of America. **The information furnished in these interim statements reflects all adjustments that are, in the opinion of management, necessary for a fair statement of the results for such periods....**

\*     \*     \*

The Company continues to enhance its segment reporting process methodologies. Changes to the operating segment structure and to certain of the foregoing performance measurement methodologies, specifically funds transfer pricing, 4 were made during the first quarter of 2003. Additionally, effective January 1, 2003, the primary management responsibilities for the Company's originated home loan mortgage-backed securities portfolio were transferred from the Home Loans and Insurance Services Group to the Company's corporate treasury operations.

### Controls and Procedures

**An evaluation was performed under the supervision and with the participation of the Company's management, including the Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of the design and operation of the Company's disclosure controls and procedures within 90 days before the filing date of this quarterly report.** Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's disclosure controls and procedures were effective. *There have been no significant changes in the Company's internal controls or in other factors that could significantly affect internal controls subsequent to their evaluation.*

We intend to review and evaluate the design and effectiveness of our disclosure controls and procedures on an ongoing basis and to improve our controls and procedures over time and to correct any deficiencies that we may discover in the future. **Our goal is to ensure that our senior management has timely access to all material financial and non-financial information concerning our**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT; DEMAND FOR JURY TRIAL – 24
F:\Main\WULF US\Lev v. Killinger\Pleadings\Complain (2) doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 624-5500

business. While we believe the present design of our disclosure controls and procedures is effective to achieve our goal, future events affecting our business may cause us to modify our disclosure controls and procedures.

53. **Killinger Certification.** The 1Q.03 Form 10-Q also contained a certification by Defendant Killinger purporting to certify the veracity of the Company's disclosure and reporting, in compliance with the Sarbanes-Oxley amendments to the Exchange Act, as follows:

I, Kerry K. Killinger, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Washington Mutual, Inc.;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

    (a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

    (b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date") and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT; DEMAND FOR JURY TRIAL - 25
J:\Main\WLE-LIN.ce v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF
MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

(c)  presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors " (or persons performing the equivalent functions):

(a)  all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

(b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.  The registrant's other certifying officers and I have indicated in this quarterly report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

*   *   *

## CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER

Pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, Kerry K. Killinger, the Chief Executive Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10-Q fully complies with the requirements of Section 23(a) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of the Company.

54.  Casey Certification. The 1Q:03 Form 10-Q also contained a certification by Defendant Casey purporting to certify the veracity and transparency of the Company's disclosure and reporting, in compliance with the Sarbanes-Oxley amendments to the Securities Act, as follows:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT; DEMAND FOR JURY TRIAL - 26
J:\Main\L\LF-LDI.cc v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

I, Thomas W. Casey, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Washington Mutual, Inc.;

2.  Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period by this quarterly report;

3.  Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

    (a)  designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

    (b)  evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

    (c)  presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

(a)   all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal 4 controls; and

(b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.   The registrant's other certifying officers and I have indicated in this quarterly report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

\*     \*     \*

## CERTIFICATION OF THE CHIEF FINANCIAL OFFICER

Pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, **Thomas W. Casey, the Chief Financial Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10-Q fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of the Company.**

55.   The above-quoted statements by Individual Defendants were materially false and misleading when made. Individual Defendants should not have reassured investors that their controls and procedures were adequate, and that the information in their 1Q:03 Form 10-Q was reported accurately, given their knowledge of the Company's computer system problems. As set forth in the false and misleading financial reporting section below, Individual Defendants were required under GAAP and SEC reporting requirements to disclose the risks and uncertainties related to mortgage banking hedging activities, yet Individual Defendants did not disclose the fact that they had technology problems that prohibited accurate hedging. Instead,

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 28
P:\Main\3LEE\LPLee v. KDlinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

1  individual Defendants misled investors in an effort to artificially inflate the Company's stock.

2  individual Defendants also misled analysts, who subsequently gave the Company high ratings.

3       56.     Zacks "Buy" Rating.  Demonstrating the impact of Individual Defendants'

4  statements, on May 30, 2003, Zacks Investment Research reiterated its "BUY"

5  recommendation on shares of the Company, and published a release on Business Wire which

6  stated, in part, the following:

> Washington Mutual Inc. (NYSE:WM) is engaged in consumer banking,
> mortgage banking, commercial banking, financial services, and consumer
> finance. Last month WM announced record earnings of $1 billion, or $1.07 per
> diluted share, for the quarter ended March 31, 2003, up +8% on a per share basis
> from $956 million, or 99 cents per diluted share for the same period a year ago.
> The $1.07 result beat the Street by 3 cents, which might not sound like much,
> but considering the tough economic environment it was very refreshing. After
> the announcement, several analysts began slightly bumping up full year
> estimates along with estimates for next year. Even close to its 52-week high, if
> the markets continue on their bullish path, analysts feel there is still plenty of
> room for appreciation. With a solid history of meeting or beating the Street's
> EPS estimates, investors may still want to take a look into WM.

14  **B.    Second quarter of 2003 ("2Q:03")**

15       57.     2Q:03 Results.  On July 15, 2003, Washington Mutual published a release on

16  Business Wire which reported record setting financial results for the second quarter of 2003,

7  the period ending June 30, 2003.  In that release, Defendant Killinger focused on the

8  purportedly "balanced" nature of the Company's business model.  Defendant Killinger is

9  quoted in the Company's July 15, 2003 press release as stating, in part:

> "Building on first quarter's momentum, Washington Mutual's balanced business
> model continued to deliver strong results in the second quarter."

Moreover, the Company represented that its risk management activities were effectively

mitigating changes in Washington Mutual's MSR valuation:

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 29
J:\Main\WMLE-DLLee v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

With interest rates remaining at near historic lows, high prepayment rates have reduced the value of the mortgage servicing asset; however, as in prior periods, the company's risk management activities effectively mitigated the change in the MSR valuation.

58. **2Q:03 Conference Call.** On July 16, 2003, the day after publication of the Company's July 15, 2003 release regarding its second quarter 2003 financial results, Washington Mutual hosted another conference call for investors and analysts. During the July 16, 2003 conference call, Individual Defendants continued to assure investors that Washington Mutual was positioned well for the eventual change in interest rates. Defendant Casey stated:

Our tremendous second quarter results demonstrate the continued successful execution of our business strategy.

\* \* \*

All parts of our business are delivering according to plan. **And in spite of an operating environment that presents a diverse mix of challenges and opportunities, our balanced business model allowed us to achieve record earnings.**

\* \* \*

Looking ahead, keep in mind that the servicing portfolio can be expected to contribute significant earnings when the interest rates eventually do rise.

\* \* \*

**We remain focused on balancing the demands of today while positioning the company for the eventual change in interest rates.** As we share[d] with investors at our June investor day, Home Loans is prepared for rapid changes in the interest rate environment. **We are confident that our balanced business model will provide the flexibility to grow market share in changing environment.** Our unique model combines our origination strength, not only in today's market, with a fixed rate product preference, but also with a broad product line of adjustable rate offerings, which will be in demand when consumers preferences shift in a rising rate environment.

\* \* \*

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 30
J:\Main\WALE\LM.ea v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF
MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE  SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

**We continue to actively monitor and collectively manage our sensitivity to changes in interest rates and still feel confident with that guidance.**

59.    During the question and answer session of the Company's 2Q:03 conference call, Defendant Casey responded to questions from stock market analysts regarding, among other things, Washington Mutual's performance in the face of known, rising interest rates:

BRUCE HARTING, ANALYST, LEHMAN BROTHERS: On the moving parts on the mortgage banking income, is -- you know, you've been very consistent in terms of quarterly all-in income around the $700 million level.  Is that basically the plug number you know, for the balance of this year that we should expect, as well?  And with the interplay, you know, for the period of time you're saying that the majority increase in comp and expenses is loan originating related.  I'm looking at the MBA estimates for next year, saying that, you know, we'll probably see, you know, if they are right, we go from 3 1/2 trillion, roughly to $1.9 trillion in '05 and down to $1.5 trillion of volume.

Can you just talk through sort of the moving parts in terms of the revaluation gain from derivatives offset, you know, and the gain from mortgage loans, and what specifically happens to the amortization number as rates start going higher?  Does your third party evaluation method say certainly the impairment goes away, but do the servicing rights decrease as well?  And does the MSR ratio go up?  Thanks.

THOMAS CASEY: Let me break those into two pieces.  On the MSR, one; I want to make sure everyone understands that we feel very, very good about our performance.  If you look on the Schedule 11 that we've given in the supplement, you can see the pieces.

I will comment on a couple of the key ones.  First, we are seeing significant amortization with constant repayment rates being at all-time highs, you would expect that.  We are also seeing impairment because of the significant decline in rates that we saw for the quarter.  So those two lines you can see at a billion dollars thirty-two, as well as $309 million.

In addition, we did see reevaluation gain of about $745 million.  We also got some net settlement, which is just the positive carry we get on our hedges, and we took about $140 million of gains from our available for sale portfolio, which we've done in the past, we didn't do it last quarter, but we did do it this quarter.  If you take those pieces together, Bruce, we typically have been running at you

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT; DEMAND FOR JURY TRIAL - 31
J:\Main\M.E-LB\Lee v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF
MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

know, a 375 to 400 -- actually as high as 550 in the end of year -- of change of the MSR that's not covered by risk management.

So, coming through the financial statements is about $400 million of amortization or impact from changes in value. So we feel pretty good the quarter over quarter pieces and parts there. **With regard to your comment about changes in interest rates and the impact it will have on the market, we consistently and have been talking about this for quite some time, that we're preparing for this. This is not new news.**

**We have been stressing our environment to anticipate this kind of shortfall, so that the team has the plans in place and triggers in place to anticipate slowdowns in volumes,** notwithstanding the conversation we just had about ARMs, which we think is a competitive advantage for us to mitigate some of our volume shortfall, given our broad product lineup. **We feel very good about that, but the forecast for the slowdown of the market is not new news. We've been anticipating that for quite some time.** So, in total, MSRs performing very, very well. I would expect our continued discipline to continue to produce results that we're comfortable with, and again, the NBA [sic] view of the market is consistent with our own.

60. The above-quoted statements by Individual Defendants were materially false and misleading when made. Not only did Individual Defendants continue to claim that they had a balanced business model, but Individual Defendants took the further step of stating that they were prepared for rapid changes in the interest rate environment when that was not true. Individual Defendants further stated that they had positioned the Company for an eventual change in interest rates, which they had been anticipating for "quite some time," but, as set forth below, a subsequent rise in rates forced Individual Defendants to admit that they had been less than candid in their disclosures.

61. The publication of Individual Defendants' material false and misleading statements had their intended effect. As further evidence of this, immediately following the filing of the Company's 2Q:03 Form 10-Q, analysts at major brokerage houses issued positive reports on Washington Mutual which stated, in part, the following:

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 32
J:\Main\ULE-LIN\Lee v Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF
MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

**Fox-Pitt, Kelton, July 17, 2003**

We are reiterating our Outperform rating on Washington Mutual, as we believe that the company is well positioned (particularly relative to how it has been in the past) to deliver earnings growth as mortgage origination volume declines and when interest rates (both short term and long term) rise.

            \*      \*      \*

Washington Mutual has undertaken several steps over the past 18 months, some 10 of which have included sacrificing current earnings growth, in order to deliver a continued stream of earnings growth in a less favorable interest rate cycle.

**USBancorp, July 16, 2003**

WM CEO Kerry Killinger updated the Company's outlook for earnings for 2003 and gave an initial outlook for 2004, essentially blessing EPS within the range of current estimates for 2003 and between $4.70 and $4.80 for 2004.

            \*      \*      \*

We are maintaining our estimates and reiterate our Outperform rating and $48 target price. We view WM as a unique leading consumer financial services company with a combination of high visibility of low double-digit long-term earnings growth and 20% return on equity...

**Citigroup, July 16, 2003**

Following WM's 2Q03 earnings conf call, we are raising our 2003 EPS est to $4.39 from $4.34. We are also raising our 2004 EPS est to $4.76 from 4.70, and our price target to $45 from $41.

            \*      \*      \*

Our new price target of $45 represents 9.4x our 2004 EPS estimate. We arrive at our new price target by rolling the same multiple forward on our 2004 EPS estimate.

62.    **Jefferies' Report: "Ready for Higher Rates."**  In addition to the foregoing, a report issued by Jefferies Securities on July 17, 2003 explicitly discussed why investors should believe that the expected run-up in interest rates would have a positive effect on the Company

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 33
J:\Marita\ALF.LBLee v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
3601 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

in the foreseeable near-term. This release stated, in part, the following demonstrating the effect of Individual Defendants' false statements:

> **ARMed and Ready for Higher Rates**
>
> We are reiterating our Buy rating on shares of Washington Mutual and our 2003 EPS estimate of $4.48 while raising our 2004 EPS estimate from $4.65 to $4.80. Our price target remains $50. WM shares have sold off by 6% compared to less than 2% for the S&P 500 since the most recent market peak in mid-June. We'd use this pullback for accumulation because of, rather than despite, the run-up in mortgage rates. Why? Put simply, Washington Mutual is the nation's largest originator of adjustable rate mortgages (ARMs). The recent run-up in fixed rate mortgages rates makes ARMs more attractive. Further, with the steeper yield curve, WM's cost of finds should stay low thereby mitigating spread compression, while at the same time slowing prepayments which increases earning assets and therefore net interest income.... During the earnings conference call, CEO Kenny Killinger raised guidance to $4.42, and affirmed $4.70 to $4.80 per share for 2004. Our "high end" estimates of $4.48 per share for 2003 and $4.80 for 2004 — reflect rational exuberance for the earnings prospects of the nation's largest adjustable rate mortgage (ARM) lender. Shares trade at under 9x our 2004 EPS estimate with an announced increase in the dividend to yield 3.85% at today's stock price. With less exposure to corporate and international borrowers than super-regional banks, Washington Mutual is an S&P 500 bank with a compelling consumer finance growth story priced at a deep value multiple.

63. **2Q:03 Form 10-Q.** On or about August 14, 2003, Individual Defendants filed with the SEC the Company's quarterly financial report pursuant to Form 10-Q. The 2Q:03 Form 10-Q represented it was accurately reporting its financial results and maintained adequate systems of internal operational controls. The 2Q:03 Form 10-Q also contained certifications by Defendants Killinger and Casey purporting to certify the veracity of the Company's disclosure and reporting, in compliance with the Sarbanes-Oxley amendments to the Exchange Act, which were also substantially similar, if not identical, to those certifications previously executed by these Defendants and filed along with the Company's 1Q:03 Form 10-Q, reproduced herein, supra.



LAW OFFICES OF
MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

64.    **Killinger Presents at Lehman Conference.**  Following the publication of the Company's 2Q:03 financial results, on September 9, 2003 Defendant Killinger appeared at a Lehman Brothers Financial Services Conference.  At that conference, Defendant Killinger once again publicly presented that Washington Mutual was continuing to perform well, notwithstanding the many challenges facing its business. Killinger stated, in part, the following:

> We do continue to manage our credit risks function very carefully.  I think we continually improve all of our metrics and monitoring and put in some terrific talent that is staying right on top of all this.  And as Bruce mentioned in his introductory comments, they'll come back at the end.  I think we have been able to create significant shareholder value even, you know, throughout all the various challenges and different economic cycles that we have operated in over the years.

65.    Again, during the September 9, 2003 Lehman conference Defendant Killinger further conditioned investors to believe that the Company's "unique" business model would foreseeably allow Washington Mutual to operate according to plan, regardless of whether interest rates increased, as was expected at that time:

> **Now that interest rates have increased, we have seen a reduction in the number affixed rate applications.**  That's down fairly significantly -- about 40% -- and an increase in the number of applications who are requesting adjustable rate loans.  So that one's up fairly sharply and expected in this environment.  Now, I think, in the  current interest rate environment, we expect that gains from fixed rate mortgage loans will be significantly lower than in prior periods, due to the decline in fixed rate applications.  And because we record our gain at the time of rate lock, the gain will trend down as applications fall, even though loan funding may remain high for a period of time.
>
> **Now, this particular effect has been heightened in the current quarter by several mortgage banking process system challenges, which I think came to light as a result of the spike in interest rates in late July and August and it's created some imprecision in the matching of our loan commitments and pipeline hedging activities.** And the result will be a loss in the quarter from the sale of mortgage loans, which is not entirely offset by our hedging activities. **Now, we took immediate steps to address any of the operating challenges and are back on track.**

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

1
2
3
4
5
6

> But fortunately, despite all this, our balanced business model has other parts, which performed very well in this interest rate environment. Because rates have risen, for example, we experienced a large recovery in the value of our mortgage servicing rate assets as well as reduction in mortgage servicing rate amortizations. And while a substantial portion of that benefit of course, is offset with some of the hedging activities that we do, we do expect a recovery to outpace the loss on the derivatives. In addition, we have already seen an increase in production of adjustable rate loans, which I mentioned earlier. So you're going to be seeing our retained portfolio grow fairly significantly.

7
8
9
10

> Now, to make room for all of this loan growth, you will see us sell certain mortgage-backed securities and agency bonds, which we have, but fortunately, those are in a position to have significant gains. And lastly, as we discussed in the first and second quarters, we took proactive steps to reposition our balance sheet for a rising interest rate environment and we're now in a position to recognize gains in the third quarter.

11
12
13

> So as we look ahead, we have been preparing for this eventuality for quite some time. We are well positioned to reduce our temporary in contract employment base and the other things I mentioned earlier about how we have maintained a very variable cost structure. So overall, as I look at the impact of these changing interest rates on Washington Mutual, I believe that our balanced business model is performing just as anticipated.

14

In his September 9, 2003 presentation, Defendant Killinger also noted that sequential new

15
16

home loan applications had plummeted almost 40% compared to the prior month, as interest

rates rose in that period, and that loan refinancings had fallen almost 80% from the high in May

17
18

2003. These conditions were, therefore, factors already taken into consideration by Individual

Defendants at the time they conditioned investors to believe that these occurrences would not

19
20

have an adverse material impact on the Company's near-term financial results.

21

66.     During the question and answer session of the September 9, 2003 Lehman

22

conference, an unidentified participant asked Defendant Killinger questions about the

23

Company's MSR recovery. That participant's question (set forth below) was answered by

24
25

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, Suite 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

1  Defendant Killinger with yet another set of misrepresentations indicating that Washington
2  Mutual was meeting the challenges associated with rising interest rates:

3      UNIDENTIFIED PARTICIPANT: Kerry, you know, in terms of the
       components that you went through on the third quarter, assuming rates don't go
4      back down and allow the refi index or refi activity to pick up again, will most of
       these inflection point changes have flushed through the income statement in the
5      third quarter? And when you said that the decline in gains on sales, due to the
       sharp decline in load volume in the third quarter, will be offset by MSR
6      recovery. Is that something that needs to get a third party appraisal through your
       auditor to mark up the value of the MSR to the level of your reserves?
7
8      KERRY KILLINGER: Well, again, there are a number of moving parts when
       the interest rate environment changes this much. **And the point that I was**
9      **trying to make earlier is that, by design, we have a balanced business**
       **model, which is not intended to ever max out in a cycle.** I want to have
10     countervailing forces going on so that we have an opportunity to be successful
       in all parts of the cycle. The last couple of years, the driving force of
11     profitability has been very strong gain on sale, relatively diminished asset
       growth, because it's been difficult to grow in an adjustable rate environment,
12     pressure on loan servicing and the value of mortgage servicing rights because
       interest rates were coming down and prepaying of those and somewhat offset,
13     on that latter one, with the hedging activities. That's been the basic dynamic.

14     **What's going to happen beginning in the third quarter is the transition to a**
15     **different environment and it's going to show the balance, I believe, in our**
       **business model.** Yes, gain on sale will have a significant reduction from what it
16     has been in recent times. And particularly with the volatility we've been
       through in this particular quarter, it will actually be into a loss position.
17
       But on top of that, we will have a very favorable environment, I believe, for loan
18     servicing and that will show up through the value of the mortgage servicing
       rights, much less amortization of those servicing rights and probably a return to
19     growth of the servicing portfolios on a net basis again. And that's, again, a shift
       in what it has been from recent quarters. And also, we should then get some
20     impetus with higher asset growth because of the adjustable rate lending
21     environment.   So the income statement components will change fairly
       significantly from one quarter to another. It's just reflecting a new environment.
22     **But that's exactly why we set the business model up the way it is today to be**
       **successful in parts of that cycle.**
23

24

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1601 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

67.    The above-quoted statements by Individual Defendants were materially false and misleading when made.  Again, despite knowing that proper hedging was not possible given the Company's deficient computer systems, Individual Defendants boldly claimed that they could operate according to plan "regardless of whether interest rates increased," and they claimed to have a "very variable cost structure" that would help them do so.  Indeed, Individual Defendants asserted that rising interest rates would merely show the balance that they had achieved.  Individual Defendants also stated that the problems they had uncovered had been addressed and the Company was back on track.  These statements are undermined by Individual Defendants' later admissions that the Company lacked an ability to track its pipeline and, thus, hedge (i.e., balance) its risk.  Following Individual Defendants' September 9, 2003 disclosures, which admitted certain problems but which strongly reassured investors that these problems were resolved, Washington Mutual shares fell from $39.70 at the close of the market on September 8, 2003 to $38.86 at the close on September 9, 2003 and to $37.19 at the close on September 10, 2003.  These partial disclosures revealed only a small fraction of the Company's problems and Individual Defendants' concurrent positive assurances had the intended effect of maintaining (and increasing) the artificial inflation in the price of Washington Mutual stock in the days and months that followed.

**C.    Third Quarter of 2003 ("3Q:03")**

68.    **3Q:03 Results.**  On October 21, 2003, Washington Mutual published a release on Business Wire which purported to announce another set of record setting financial results for the third quarter of 2003, the period ending September 30, 2003, starting in part, as follows:

> "Continued growth of accounts and our key loan portfolios, and the expansion of our national franchise led to another solid quarter for the company" said Kerry Killinger, Washington Mutual's chairman, president and CEO.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 38
J:\Main\MLE-Lilee v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

"**Although the period was marked by significant volatility in interest rates, we continued to see positive trends in the key drivers of our business.**"

The Company also announced that it recorded a net loss from mortgage loans of $126 million, after revaluation gains on derivatives (loans held for sale risk management), compared with a net gain of $475 million in the prior quarter. Notwithstanding Individual Defendants' prior repeated assurances that Washington Mutual had, among other things, been preparing for the eventuality of a rising interest rate environment, the third quarter loss from mortgage loans was due, in part, to significant volatility in interest rates during the quarter and previously reported operational issues in the Company's mortgage business. Notably, however, Defendant Killinger's emphatic response to this loss was that Washington Mutual had these problems under control. "We have identified the issues that led to these challenges and have implemented measures to address them," Killinger said in the October 21, 2003 press release.

69. **3Q:03 Conference Call.** On October 22, 2003, the day after publication of the Company's October 21, 2003 release announcing its third quarter 2003 financial results, Washington Mutual hosted a conference call for investors and analysts. During the October 22, 2003 conference call, Individual Defendants Killinger and Casey further addressed the Company's loss in the gain from mortgage loans line item. Once again, however, Defendant Killinger assured investors that they had "identified the issues that led to the problems, and have already implemented appropriate measures to address them." Defendant Casey elaborated on those problems during the call:

> Now let me provide some color on the market-driven issues that continued to the loss from mortgage loans. These fell into two main areas — first, the extreme volatility in interest rates drove inefficiencies in the market for a period of time. As we've seen with many other lenders, this situation impacted our ability to effectively hedge the pipeline. As you'd expect, a component of our hedging strategy assumes that a certain percentage of

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 39
P:\Main\MI.-URLee v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

loans in our pipeline will not be funded. However, during the rate spike, we experienced a tremendous decrease in the percentage of loan fallout, as consumers rushed to close their loans at the lower rates they had locked in. Accordingly, there were times in the quarter when we incurred losses, as we repositioned the hedge in response to significant interest rate movements.

\*       \*       \*

Now, you'll recall that in early September, we also said that operational problems in our home loan business would contribute to third-quarter results. As Kerry mentioned earlier, we have identified these issues and implemented the appropriate measures to address them. They were timeliness of information flows, due to the tremendous volume in our loan fulfillment area. This resulted in certain loan commitments not being reflected in our hedging profile on a timely basis.

The second item that affected us was that during the apex of the third-quarter volatility, many of the loans in the pipeline were not funded within their specified rate lock period, through no fault of the borrower. We honored the lower interest rate commitments made to those customers, resulting in losses on those loans. We have addressed these problems through improved information flows, better tracking of loan commitments and stronger oversight. Performance has since improved, and we are returning to normal conditions. In addition, by historic standards, interest rates remain relatively low, and the mortgage market continues to be solid, as reflected in our home loan volume of 115.4 billion in the third quarter, compared to 108 billion in the second quarter. If this type of environment were to continue, we would expect the gain from mortgage loans to be lower than in this year's record first half, but certainly much better than the third-quarter performance.

70.     During the question and answer session portion of the October 22, 2003 conference call, Defendants Killinger and Casey once again gave repeated assurances that Washington Mutual's operational problems were solidly under control:

CHARLOTTE CHAMBERLAIN, ANALYST, JEFFRIES SECURITIES: Two questions. First is on dry powder. Can you give us an estimate of currently what your unrealized gain in mortgage-backed security is and also the potential for reversal in MSRs that are still available going forward. And the second question has to do with your statement that you implemented measures to address the problem, the operational and I guess, hedging problem. Do you mean, you fixed them or do you mean that they are not fixed and you are

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 40
J:\Main\DLLE L\Lee v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

working on them, and if the latter is the case, when will they be fixed? Thanks.

KERRY KILLINGER: Charlotte, I'll address the last one while Tom is getting ready for the first one. I think, in terms of operational measures, as soon as we saw that there were — - was an inconsistency of the data coming in between the rate locks and what we needed to do for hedging, we jumped on that immediately, put in a very large SWAT team of folks to get their arms around things. They got that stabilized very quickly, and then we immediately implemented a variety of measures to be sure that that would not happen again. We are very confident, at this point in time, that the flows of information are accurate, and that the financial risk that we encountered early in the third quarter is taken care of at this point....

BRADLEY BALL, ANALYST, PRUDENTIAL: ...   But related to the operational issues and the hedging issues in the quarter, were there more than just the top two members of management that left? And are there other staff changes to be expected, going forward?

KERRY KILLINGER: Well, again, we have a very, very strong and seasoned team of people in our home lending area. We did make some changes I mentioned, both to put the entire area under Deanna Oppenheimer, along with all of our consumer businesses. We also made a change to put a very seasoned mortgage veteran, Tony Meola, to be in charge of the production and the key interfacing that we have with the customers. We also made a change to bring in our strongest operations person in the organization, Diane Beido, who has run the operations for all of our consumer group. We put her in charge of doing that for the home lending group, because we felt that it was time to bring the strongest expertise we had in the whole complex to make that happen. Again, they are going through a very thorough review of everything that we have. I think there are enormous opportunities for improving efficiency and improving our service. And I think, again, just stepping back for just a moment, we went through a period of rapid acquisitions, through the acquisitions of PNC Mortgage, fleet Mortgage, HomeSide Lending and then North American Mortgage that came to us as part of the Dime. Because we needed to respond to the refinancing boom, and we needed to have the volume capacity that it took to be able to handle that, we had to put the final integrations of these acquisitions a bit more on the back burner. **And now that refinancings are slowing down, we are really going to tune up and dial up the efforts to complete all of the final operational integrations coming off those acquisitions, and getting the true efficiencies that can come out of it.** So part of the reasoning -- in Tom's and my prepared remarks, we commented about the importance of cost saves to

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 41
F:\Main\LM.E-LM.ce v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

achieve our financial results next year. With knowing that there are significant opportunities in the home lending group to drive out these final efficiencies from these acquisitions, those, of course, need to be done in addition to being able to respond to the cyclical change that's going on with a slowdown in the home origination business, from a reduced amount of re-financings. So again, we have significant efforts underway....

KRISTINA CLARK: I was wondering if you could please elaborate on whether or not the tracking error operational issues you saw come to light this quarter affected prior quarters, perhaps resulting in some gains?

THOMAS CASEY: Kristina, this is Tom Casey. No; we have looked at that, and this was really as a result of the spike in rates that really resulted in the loss for the quarter. And, as Kerry mentioned, we quickly got on the problems, and those problems are behind us. So we feel very good about our progress.

ED GROSHANS: I guess this kind of ties into your responses on the efficiencies and whatnot. When you bought HomeSide Lending, you said it would be several years; you were going to look to move everyone unto that platform. So I wanted to get a sense of how many MSR platforms you are operating on, and how long it will take to get to the HomeSide platform, if that is still what the goal is? And then, on the origination side, are you still on one platform there, or is it several platforms on that side, also?

KERRY KILLINGER: Excellent questions. And I think we continue to be in ... all I'll say is the final process of evaluating all of both the origination and the servicing platforms that we want to ultimately have. Particularly in light of our organizational approach that we want to have, of having as seamless as we can going over to what we're doing in the banking side of the business, as well. So we're going through those final evaluations. I will say, in general, you have heard us talk about over time that the Optis origination system has been one that has been phased in. It has been very successful in certain parts of getting a standardized information screen out to our originators and so forth.

71. The above-quoted statements by Individual Defendants were materially false and misleading when made. Although Individual Defendants, in an attempt to maintain the artificial inflation of Washington Mutual's stock, had reassured investors that they were prepared for rapid changes in the interest rate environment, and that they had been planning for

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 42
F:\Main\M.U.E-C.F.Lee v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

1  rising interest rates for quite some time, Individual Defendants now claim that "the extreme

2  volatility in interest rates . . . impacted our ability to effectively hedge the pipeline." Individual

3  Defendants, however, state in no uncertain terms that they "have identified the issues that led to

4  the problems, and have already implemented appropriate measures to address them."

5  Individual Defendants even claim to have assigned a large SWAT team of people to fix things,

6  and take the further step of asserting that in addition to quickly fixing things, Individual

7  Defendants implemented measures "to be sure that that would not happen again," and they

8  confirm that "those problems are behind us."  This demonstrates the false and misleading

9  nature of Individual Defendants' prior statements by highlighting the fact that Individual

10  Defendants were not prepared for a rise in interest rates because their technology systems were

11  incapable of providing timely and accurate information.  In addition, as set forth below, it later

12  became clear that Individual Defendants' promises that such problems were behind them were

13  also false and misleading.

14       72.    **Analysts Reports.**  The publication of Individual Defendants' material false and

15  misleading reassurances had their intended effect.  Following the publication of the Company's

16  October 21, 2003 release and Individual Defendants' third quarter 2003 conference call on

17  October 22, 2003, the price of Washington Mutual stock became even further artificially

18  inflated (the stock price increased by 3.21% on October 22, 2003). Analysts at major brokerage

19  houses issued positive reports on Washington Mutual that stated, in part, the following:

20       **Citigroup, October 22, 2003**

21       Following WM's 3Q03 conf call, we are raising our '03 EPS est to $4.41 (was
         $4.39), leaving our '04 est of $4.76 unchanged, and introducing an '05 est of
22       $5.25 (+10% yr/yr).  We are also raising our target price to $47 from $44.

23       **USBancorp, October 23, 2003**

24  VERIFIED SHAREHOLDER DERIVATIVE
    COMPLAINT; DEMAND FOR JURY TRIAL - 43
25  P:\Main\WLE-LB\Lee v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 6600
SEATTLE, WASHINGTON 98154-1115
(206) 623 5890

1   While WM reaffirmed its '03 and '04 outlook, we are reducing our estimates by
    $0.02 in '03 and by $0.10 in '04. Our new '04 estimate is at the mid point of
2   WM's 2004 outlook, which is in a range of $4.70 to $4.80.

3                          *      *      *

4   We are maintaining our Outperform rating and $48 target price which is 10x our
    23 2004 EPS estimate and in line with historical valuations....
5
6   **Jefferies Securities, October 23, 2003**

7   We are reiterating our BUY rating on shares of Washington Mutual without
    changing our 2003 EPS estimate at $4.48 or our 2004 EPS of $4.80. We are
8   initiating a 2005 EPS estimate of $5.10.  The revelation of WM's recent
    earnings call was the $400 million ($0.27 per share after tax) price tag that
9   management estimated for the operational and hedging problems from its
    mortgage business during 3Q03 CEO Kerry Killinger assured conference call
10  participants that the problem would not happen again...  The Company
    reaffirmed guidance for 2003 and 2004 consistent with FC consensus... Shares
11  look especially undervalued at current levels, offering 6% earnings growth in
    2004, plus a 4% dividend yield yet 6 trading at steep discounts to mortgage
12  rivals... Our price target remains $50.

13      73.    **3Q:03 Form 10-Q.** Thereafter, on November 13, 2003, Individual Defendants

14  also filed with the SEC the Company's quarterly financial report pursuant to Form 10-Q. The

15  3Q:03 Form 10-Q contained representations that the Company maintained adequate systems of

16  internal operational controls.  In addition to the foregoing, the 3Q:03 Form 10-Q also contained

17  certifications by Defendants Killinger and Casey purporting to certify the veracity of the report

18  which were also substantially similar, if not identical, to those certifications previously

19  executed by these defendants and filed along with the Company's 1Q:03 and 2Q:03 Forms 10-

20  Q.

21      74.    Notably, the 3Q:03 Form 10-Q contained specific additional assurances that

22  Washington Mutual had undertook numerous actions to correct the operational performance

23

24  VERIFIED SHAREHOLDER DERIVATIVE
    COMPLAINT; DEMAND FOR JURY TRIAL - 44
25  J:\Mam\UALB-L\RLee v. Killinger\Pleadings\Complaint (2).doc

                                         LAW OFFICES OF

                        MIKKELBORG, BROZ, WELLS & FRYER PLLC
                                   1001 FOURTH AVENUE, SUITE 3600
                                   SEATTLE, WASHINGTON  98154-1115
                                          (206) 623-5890

1   and market volatility issues that adversely impacted the Company during 3Q:03. The 3Q:03

2   Form 10-Q stated:

3       The Company recorded a loss from mortgage loans, net of revaluation gains
        from derivative used as loans held for sale risk management instruments, of
4       $126 million in the third quarter of 2003, compared with a net gain of $475
        million in the preceding quarter.  **During the third quarter, the Company**
5       **experienced market volatility and operational performance issues that**
        **adversely impacted the risk management of interest rate lock commitments**
6       **on residential mortgage loans to be sold.** Despite the sharp rise in mortgage
        rates that occurred in late July and early August, refinancing application volume
7       remained at high levels during this period as borrowers attempted to obtain rate
        locks before rates potentially moved even higher. Additionally, borrowers with
8       existing rate lock commitments had a strong incentive to fluid their loans before
        the locks expired, which caused the expected fallout rates on these commitments
9       to decline to extremely low levels. **This created capacity issues within loan**
        **origination systems, which often culminated in rate lock extensions for**
10      **loans that could not be funded within their prescribed timeframe. Due to**
        **information gaps that occurred between loan origination systems and the**
11      **secondary marketing risk management system, many of these rate lock**
        **extensions also were not economically hedged.    Origination system**
12      **processing interruptions also occurred during this period of market**
        **volatility, which delayed the entry of new rate lock information into the risk**
13      **management system and resulted in further economic hedge ineffectiveness.**

14

15                                      *       *       *

16      The Company undertook numerous actions to correct these issues and to
        mitigate their financial effects.  Corrective measures include the timely
17      Interface of rate lock activity from the origination systems to the secondary
        marketing risk management system, a more rigorous origination oversight
18      process that prioritizes loan funding resources, thereby reducing the
        occurrence of rate lock extensions, and a broader diversification of
19      derivative instruments used to risk manage rate lock commitments and
        loans held for sale. In addition, the Company sold a significant amount of
20      available-for-sale securities during the third quarter of 2003.  The gains
        recognized from these securities sales consisted of $258 million in gains from
21      originating mortgage-backed securities and $381 million of gains from the sale
        of other available-for-sale securities.

22

23

24  VERIFIED SHAREHOLDER DERIVATIVE
    COMPLAINT: DEMAND FOR JURY TRIAL - 45
25  J:\Mam\MLH\LH er v. Killinger\Pleadings\Complaint (2).doc

                                                    LAW OFFICES OF
                                        MIKKELBORG, BROZ, WELLS & FRYER, PLLC
                                                1001 FOURTH AVENUE, SUITE 3400
                                                SEATTLE, WASHINGTON 98154-1115
                                                      (206)623-5890

1    75.    **Moderate Revision and Continuing Misrepresentations.**   On December 9,

2  2003, Washington Mutual issued a release which purported to reaffirm and moderately adjusted

3  downward Individual Defendants' growth initiatives and guidance for 2004, and which also

4  addressed a recent cost reduction and growth initiatives campaign.

5    76.    On the same day, December 9, 2003, Individual Defendants reiterated their

6  assurances at Washington Mutual's December Investor's Day Conference that, among others,

7  Washington Mutual's risk management was improving and its risk profile strengthening,

8  notwithstanding the Company's operational problems and the challenges of increasing interest

9  rates. Defendants Killinger, Casey, and Oppenheimer were all in attendance at that conference.

10  Attendees were encouraged by Killinger to interact with the Company's management team

11  during the breaks and lunch.

12    77.    At the December 9th conference, Defendant Killinger told investors:

13       . . . there's more to risk management than staying on top of the balance sheet.
       **Under the leadership of Bill Longbrake, we have developed sophisticated**
14       **risk management tools and processes which have allowed us to perform**
       **very well in a highly volatile interest rate environment. This has given me a**
15       **great deal of comfort in our management of risk overall.**

16       Now, in the area of credit quality, we are in the best shape we've been in for
       quite some time. With the help of Jim Vanasek, we have instilled the philosophy
17       that any good sales culture rests on the foundation of a strong credit culture.
       **And this means that credit and risk management practices must infuse the**
18       **entire operating culture of the company, and I believe we've made good**
       **progress in this area.**
19

20    78.    Defendant Casey told investors at the December 9th conference:

21       The takeaway here is that we successfully executed critical aspects of our plan,
       but we weren't perfect.   Kerry mentioned we also experienced operational
22       challenges in our own mortgage business in the third quarter.  As we stated on
       several occasions, we have identified the issues that lead to these problems
23       **and have implemented the appropriate measures to address them.**

24  VERIFIED SHAREHOLDER DERIVATIVE
    COMPLAINT; DEMAND FOR JURY TRIAL - 46
25  J:\Main\MLE-LDLee v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623 5890

1

2                                *     *     *

**As a side note, you'll see that we have not included the third quarter in this
slide because of our operational problems distorted our gain on sale for that
quarter. However, on an adjusted basis, the impact would be similar.**

3

4      79.    When questioned by an unidentified participant at the December 9th investor's

5 Day Conference regarding what is "idiosyncratic to Washington Mutual's hedging versus

6 what's in the market," Defendant Casey flatly denied that the Company's hedging was different

7 than other companies:

8      **UNIDENTIFIED: Getting back to the basis points in gain on sales, could you
dissect that for us, what it is idiosyncratic to Washington Mutual's hedging
versus what's in the market?**

9

10     **THOMAS CASEY: OK, first thing, on the hedging, we don't have anything
special going on. We're hedging the same way everyone else is. Ten basis
points is already adjusted for our hedging.**

11

12    80.    Defendant Oppenheimer provided further detail at the December 9th conference

13 regarding Washington Mutual's purported integration of its mortgage origination and servicing

14 systems and related technologies:

15      **As highlighted earlier, we have not been in a position to fully integrate the
system to the mortgage companies that we acquired in 2000 and 2001. The
end of the refinance wave now affords us that opportunity, and this slide
shows you that our point-of-sale origination system, Optis.1, is now rolled
out to the vast majority of our systems.**

16

17

18

19     We anticipate that we'll be on a common operational and technology platform
for loans servicing in the third quarter of 2004. We have chosen to partner with
Fidelity Financial as our loan servicing provider for two reasons. First, the
lower risk to convert the smaller home side portfolio onto the larger Washington
Mutual portfolio as opposed to the other way. The second reason is cost. Our
renegotiated agreement with Fidelity enables us to achieve the efficiencies that
we originally projected in the acquisitions of home side ALLS (ph) platforms.

20

21

22

23     In the fulfillment area we have our work cut out for us. Our past systems
integration experience in acquisitions will be put to good use as we tackle the

24 **VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 47**

25 J:\Main\MLLE-LDC ro v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

complexities of this challenge.   We currently have nine different loan
origination systems in our mainstream home lending channel.

81.   The above-quoted statements by Individual Defendants were materially false
and misleading when made.  As the investing public discovered later, Individual Defendants
had not taken measures to correct the problems that led to the Company's losses. Individual
Defendants' claim that they had sophisticated risk management tools in place was false and
misleading because the Company, in fact, continued to suffer from the same problems that had
plagued it from the beginning.

82.   On December 9 and 10, 2003, Individual Defendants admitted that the Company
was experiencing some problems and shortfalls in the face of rising interest rates; however,
they did not come close to admitting the full extent of those problems.  To the contrary,
Individual Defendants did the opposite, continually reassuring investors that the problems had
been resolved.  Washington Mutual's stock price dropped approximately 8.85% on December
9, 2003 with unusually heavy trading volume of approximately 20.5 million shares in response
to these disclosures.  On December 10, 2003, the Company's stock dropped another 3.5% on
continued, heavy trading volume of approximately 26.5 million shares.  In the days preceding
December 9, 2003, Washington Mutual's trading volume averaged between 4 million and 5
million shares.  Individual Defendants' December 9 and 10, 2003 disclosures took some, but
not all, of the artificial inflation out of Washington Mutual stock.  To the contrary, Individual
Defendants' continued false or misleading reassurances had the intended effect of maintaining
and further increasing the artificial inflation in Washington Mutual stock prices in the days and
weeks which followed.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT; DEMAND FOR JURY TRIAL - 48
J:\Main\SALE-LIN.ee v. Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF
MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

1     83.    As further evidence of this, on December 9, 2003, Fitch investment rating

2 service reviewed the Company's financial condition in light of Individual Defendants' revised

3 guidance and issued a report on the Company which stated that its rating would be unaffected

4 by Individual Defendants' moderate revision, in part, as follows:

5         Following Washington Mutual, Inc.'s (WM) announcement that it lowered its
        earnings guidance for 4Q03 today, indicating that changing conditions in the

6         mortgage market will likely result in lower origination earnings, **Fitch Ratings
        comments that WM's ratings will not be affected.** WM is rated 'A', 'F1', by

7         Fitch and the Rating Outlook is Stable. WM also indicated that, dovetailing off
        the management realignment announced in late September, **it is taking steps to**

8         **improve efficiencies throughout the organization** and will take charges in
        4Q03 associated with these initiatives. **WM's new guidance suggests that**

9         **earnings for Q03 will decline by approximately 76% to 25% compared to**

10         **the firm's strong 3Q03.**

11         **WM successfully managed through the turbulent mortgage markets of the
        past few quarters, and recorded very strong earnings for the first nine**

12         **months of 2003....**

13 (Emphasis added.)

14     84.    Moreover, at that time, analysts at Citigroup and USBancorp, among others,

15 only moderately adjusted their EPS estimates and near term price targets to account for

16 Individual Defendants' minor December 2004 revisions. Accordingly, at that time, Citigroup

17 lowered its 2003 estimate to $4.18 per share, from $4.40, and 2004 EPS estimate to $4.35, from

18 $4.76 per share; lowering its near-term market cap estimate to approximately $44 billion.

19 USBancorp lowered its 2003 and 2004 EPS estimates to $4.18 and $4.40, respectively, from

20 $4.41 and $4.75, respectively; lowering its near-term price target to $42 per share, representing

21 a market capitalization forecast of approximately $42 billion.

22

23

24 **VERIFIED SHAREHOLDER DERIVATIVE**
**COMPLAINT; DEMAND FOR JURY TRIAL. - 49**

25 J:\Main\MJLE\LBLee v  Killinger\Pleadings\Complaint (2).doc

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890

### Fourth Quarter of 2003 ("4Q:03") and Fiscal Year 2003 Results ("FY:03")

85.     **4Q and FY:03 Results.**  On January 20, 2004, Washington Mutual published a release on Business Wire which purported to announce record setting financial results for the fourth quarter and fiscal year 2003, the period ending December 31, 2003, as follows:

> "The fourth quarter of 2003 brought to a close a successful year in which we continued to profitably expand our key businesses nationally and enhance the value of our franchise," said Kerry Killinger, the company's chairman, president and CEO. "We continued to see marked improvement in our credit position as the year progressed as well. **While 2003 was a solid year for our company, rising interest rates for mortgages in the second half of the year placed pressure on our business results. Our management team is meeting the challenge head on, as reflected in the $180 million of technology write-downs and severance charges taken during the fourth quarter, and we expect our efforts to reduce costs will contribute to our results in 2004."**
>
>                    *       *       *
>
> **Outlook**
> "As we enter 2004, we have brought added focus to driving efficiencies throughout the organization while continuing to invest in growth initiatives in our consumer and commercial businesses,"** Killinger said. "We expect the results of these efforts to position us well for the future and to enhance long-term shareholder value."

86.     In addition to the foregoing, the Company's January 20, 2004 release also contained a heading "Cost Leadership Initiatives" under which followed:

> "We have a rigorous process in place and our management team is focused on reducing our cost base with the goal of becoming an industry leader in efficiency," Killinger said. "We are pleased with the initial results of our efforts but we know there is more work to do. However, given the momentum that we have, our management team is confident that we will achieve our stated reduction targets."
>
> As previously announced, the company eliminated the equivalent of 4,500 full-time positions in its home lending support operations during the last four months of 2003.  The majority of this total reflected reductions in non-employee temporary and contract personnel and decreased overtime.  Washington Mutual also anticipates a reduction of 2,900 full-time equivalent personnel in the first

LAW OFFICES OF

MIKKELBORG, BROZ, WELLS & FRYER PLLC
1001 FOURTH AVENUE, SUITE 3600
SEATTLE, WASHINGTON 98154-1115
(206) 623-5890